We'll hear argument first this morning in Case No. 16-712, Oil States Energy Services v. Greene's Energy Group. Ms. Hope? Mr. Chief Justice, and may it please the Court, for 400 years, courts have adjudicated disputes between private parties about the validity of patents. Six years ago, Congress transferred this judicial power to an executive branch tribunal that is unusual because of five features. First, it exercises the judicial power. Second, in disputes between private parties. Third, over private rights. Fourth, without both Article III supervision and consent. And fifth, about questions adjudicated in courts for 400 years. Ms. Hope, you outlined your position, but there must be some means by which the patent office can correct the errors that it's made, like missing prior art that would be preclusive. So do you recognize any error correction mechanism as within Article III? Yes, certainly, Justice Ginsburg. And our position, our position is not that the PTO is precluded from error correction. It simply can't do it through this adjudication. So, for example, we believe ex parte re-exams, which are fundamentally examinational and not adjudicational in nature, are perfectly consistent with Article III. But your brief wasn't clear on that. You recognize the difference between re-examination, but you didn't take a position on whether that would be permissible, but now you are. The re-examination procedure would be all right. Yes, ex parte re-examination. What about inter partes re-examination? I think inter partes re-examination presents a closer case, but it is still fundamentally examinational. I think in the government brief that we cite on page 13 of our reply, where the government itself draws a line between both ex parte and inter partes re-examination and says these are fundamentally examinational. Could you review for me what you mean by examinational? Certainly. I think what the government means by examinational and what we mean by examinational is that that is fundamentally a proceeding between the Patent and Trade Office, between the government and the patent owner, between the private party. But it's one, I suppose, in which anybody can participate, in other words, including the person alleging infringement, or the person challenging the grant or the patent. Not with respect to the fundamental difference. With respect to ex parte re-exam, the only role for the third party is to request, and then at that point the third party drops out. Even with respect to inter partes re-exam, where Congress gave the third party more participatory rights, the third party bears no burden of production or persuasion. It is still fundamentally a matter between the PTO and the patent. Sotomayor, there is always inherent a burden of production. You can't write the PTO and say, I think this patent's invalid, period. You have to supply them with a reason for doing what they're doing. So why is that reason? Any different than actively participating and pointing the PTO in the right direction? What is so fundamentally Article III that changes this process into an Article III violation? Both of them are just informing the PTO of the nature of its error and giving it an opportunity to correct its error. I think the fundamental difference, which is I think why the government itself has referred to inter partes re-exam as adjudicational, is it is initiated by the third party, and the third party actually prosecutes that proceeding. It is deciding a cause between the patent owner. Sotomayor, because under the rules, if the third party settles with the patent owner, the PTO can still continue the action, can still decide the question, can still participate on appeal. So it is a public issue that is being litigated or discussed or adjudicated. So isn't that quite different than a normal adjudication? I don't believe so, Your Honor. And let me push back a little bit on when you say that the PTO may continue to conduct the proceedings. Both the statute and the regulations provide that the PTAB may dismiss the case, which its public guidance says is its preference, or it may proceed to final written decision. And we've located only four instances where the PTAB, even after settlement, has proceeded to final written decision, and in every case it has informed the parties that it has already decided the case. Ginsburg. But in your brief, you said if the parties settle, the PTO can't go on. That was an error, wasn't it? Well, I believe what we did was we quoted the statute, which says it can, its preference is to settle, or it may proceed, it may proceed to final written decision. And we've, again, we've located only four times when the PTAB has done that, and again, it's already made the decision. Sotomayor's Court, Sotomayor's Court, Sotomayor's Court, Sotomayor's Court, Sotomayor's  And the question is, in terms of what is in there, in terms of whether the process is adjudicatory or not, if I own something, which is what your basic position, I understand, is, that this is a personal right, how can a government agency take that right away without due process of law at all? Isn't that the whole idea of Article III, that only a court can adjudicate that issue? I think I would say, Justice Sotomayor, in terms of matters that have been adjudicated traditionally in courts, between private parties, over private rights, I think this Court's cases have established a baseline where those matters, Article III vests those matters in Article III courts. At the same time, this Court's cases have recognized narrow exceptions where public rights, as distinct from private rights, are at issue, where Article III does not require that those rights be vested. The decisions of those rights are at issue. Kennedy, just to examine public rights, could Congress say, let's hypothesize going forward, that we will grant you a patent on the condition that you agree to this procedure? Otherwise, we don't give you the patent. Would Congress do that? No, for two reasons. First, we believe that would be an unconstitutional condition, so that Congress cannot condition the exercise of a right or a property or benefit of any sort to the article of the Constitution. So, for example, yes, Your Honor. Kennedy, what's your closest case for that? Not Krull v. Benson. That doesn't quite work. I think, I think perhaps, I think perhaps our closest case to that might be Northern Pipeline or maybe one of the bankruptcy cases, where even, even the fact that Congress had recognized, had said that it's permissible for these rights to be adjudicated in Article III court, this Court still, in Stern, held that Article III prevented the, those adjudications. But, but Congress didn't create the right in Stern, so that's quite distinguished. Let me ask you this, basic question, patent lawyers will probably know the answer. Could Congress say that we are reducing the life of all patents by 10 years? Yes, I think that would, that, that goes to the limited times requirement in Congress. Well, then that, doesn't that show that the patent owner has limited expectations as to the scope and the validity of the property right that he holds? No, Your Honor. I don't, I don't think the limited times requirement, which is the Article I, Section 8 requirement, I don't think that goes to whether Congress could, by statute, withdraw the adjudication of disputes that have been adjudicated in courts for centuries and Congress could withdraw those cases and put them in a non-Article III tribunal. Again, I don't think that goes to whether Congress could, by statute, withdraw the adjudication of disputes that have been adjudicated in courts for centuries and Congress could withdraw those cases and put them in a non-Article III tribunal.  And yet we often say, or give the government a lot of leeway in saying that they don't have to pay compensation. So if the government can restrict your property right in real property to that extent, why can't it do so with respect to patent rights? And I think the fundamental difference there, Mr. Chief Justice, in terms of takings and due process, which we haven't advanced arguments about, in Article III, which is really focused on the exercise of the judicial power, and it has really two components. It has the component that is directed toward the individual rights guarantee, so the guarantee of litigants to impartial decision-makers, and at the same time at the structural protections, the checks and balances protections that protect the judicial integrity. So I think the difference here is that when Congress, and certainly individual rights are at stake when the government takes property that belongs to one person for public use and doesn't pay just compensation, but I think in the Article III context, where Congress is taking a category of cases that have been adjudicated in courts for centuries and removes those cases, withdraws those cases to a non-Article III tribunal, that impacts not only the individual rights guarantee, but it impacts the judicial guarantees that Article III details. Ginsburg's very limited purpose, for the purpose of determining whether it's not a duplication of an infringement action, it's a narrow kind of reexamination that the – it's only for the prior art, right? And there are other restrictions, so it's not – it is geared to be an error-correction mechanism and not a substitute for litigation. Several points to that, that, Justice Ginsburg, you're absolutely correct that the grounds are under Sections 102 and 103, novelty and non-obviousness with respect to prior art. Even if that were narrow, I think this Court has said that it's no more permissible for Congress to kind of nibble around the edges as opposed to a wholesale transfer. But even so here, setting aside that those two areas of novelty and obviousness make up about 60 percent of the patent validity challenges in the district courts, the estoppel provisions provide that in the 80 percent of cases, in 80 percent of inter partes reviews, those proceedings are taking place with concurrent district court litigation. So if in those cases, if in the IPR, the patent holder wins, then the claims of the patent are canceled and the patent, the challenger goes into the district court and says the action is moot, the infringement action is moot. If it comes to that. Alito, we have a number of cases that have arguably addressed this issue already, like McCormick, for example, in which this Court said the only authority competent to set a patent aside or to annul it or to correct it for any reason, whatever, is vested in the courts of the United States. We have cases, American Bell is another one. We have that wonderful quote from Justice Story indicating that any correction to a patent has to go to a court. The United States takes the position, as I understand it, that some of those decisions are purely statutory interpretation. What's your reading of those cases? So our reading of those cases, particularly McCormick, is they are constitutional. We don't need this Court to go that far for us to prevail. It's enough in this case for the Court to hold. Why is your reading that they are constitutional, if you could help me with that? Certainly. We believe they are constitutional in McCormick because this Court wasn't, didn't reach that decision sort of in the absence of statutory authority, but in the face of it. There was at that time statutory authority in a different procedure, albeit, for the case. Sotomayor, I'm sorry. I thought in McCormick that why did the Court even bother looking at the statute? What it did, I understood, was look at the statute and say the statute basically defines the issue of a new patent being issued as one before the old patent expires. And so they were really doing a statutory analysis of whether or not by that process the old patent was expired, and they were saying, no, if you want it to expire now, you have to go to court, because there's no statutory authority for doing it currently. So I'm not quite sure how you get to the constitutional holding. I think how we get to the constitutional holding, Your Honor, is that there was at that time, there was another statute in play that would have permitted the cancellation. So it wasn't, it's not that the Court, there wasn't any statutory authority. It wasn't simply a statutory holding. It's certainly true that the Court didn't refer to Article III, didn't refer to that. Sotomayor, so can I take you back to this question of where you would draw the line between ex parte and inter partes reexamination on the one hand and this? Because as I understand what you would permit, those proceedings, too, can be initiated by a third party, you know, can be at the request of a third party, and in those proceedings, too, the third party can participate in some way, can file a reply to the patentee's statement, can make known its views. So what's the line? Where would you say, what are the procedures that are here that you think make this essentially adjudicatory that are not in those other proceedings? Certainly. I think how we would define an adjudication as it's where a tribunal is hearing and deciding a cause between two private, two private parties. So in both IP reexam and ex parte reexam, as Your Honor said, the third party essentially falls out after making the request, is able to comment. The patent office is not. Well, I didn't say they fall out. There are opportunities for it to make known its views. Certainly. So what is it? Is it discovery? Is it participation in a hearing? I mean, I just want to ground this in something. Yes. I think certainly the existence of discovery, of the hearing, all of these things show that what you have here is trial-like. What's the most that the government could do, do you think? You know, what's the what are the how many of these things do you have to take away before you have a constitutional system? I think fundamentally an adjudication, an exercise of the judicial power, and one reason we know it in this case is because it simply has taken a category of cases out and put it into the tribunal. But I think hearing and deciding a cause between two private parties that results in a final binding judgment. If the airline loses your umbrella, for example, and the CAB used to say, you go to the CAB, you complain, they lost my umbrella. The airline says, no, we didn't. Well, that was unconstitutional. No, you're right. By the way, there was judicial review, as there is here. By the way, it didn't say that your rights when you fly on an airplane or a truck or some other thing regulated, it didn't say as it does here, subject to the provisions of this title, the matter, your umbrella, or in this case, patents, shall be private property. So you have a statute that says you only get the private property if, in fact, you survive the provisions of the title, of which this is one. And in addition to that, I thought it's the most common thing in the world that agencies decide all kinds of matters through adjudicatory-type procedures, often involving private parties. So what's special about this one? Or do you want to say it isn't special and all the agency proceedings are unlawful? Because a lot of them would fit the definition, I think, that you proposed. Let me begin with your last question, Justice Breyer. I don't think that invalidating IPR would affect these for the fundamental reason that in virtually all truly administrative adjudications, those that are not administrative, those are between the government as the adjudicator. Breyer, is an airline the government? Is a trucking company the government? Is a utility, an electricity company, or a natural gas company the government? In the vast majority of administrative adjudications, it is the government or those proceedings are acting as a permissible adjunct to the district court. Kagan in this, Ms. Ho, is that this is the government in a real sense. It's the government trying to figure out whether it made a mistake by granting the patent, which the government sometimes does and knows it sometimes does. But the government wants to put in place a set of procedures that will actually increase the government's accuracy in figuring out whether it made a mistake. And that involves listening to a third party that has some interest in the proceeding. So it seems a little bit odd to say, sure, the government can reexamine this, the government can allow a third party to request it, can allow the third party to do some things, but there's some line that falls short of what the government thinks are the procedures that enable the greatest accuracy. So why would we do that? Hootman, certainly, Your Honor. And I think to be clear, we're not we're certainly not contesting the proposition that adversarial testing can't be a very beneficial proceeding for arriving at the truth. But it's useful and it's helpful when Article III protections, if it's an adjudication between private parties over private rights. Adversarial testing also requires at Article III protections a neutral decision maker not subject to having to curry favor with the executive, which is the situation that we have here. Why don't, though, Ms. Hootman, just simply say the question is whether there's a private right involved. In answering Justice Kagan's questions and Justice Breyer's questions, you've struggled with how much of an adjudication does an inquisitorial process have to have before it becomes an adjudication. Why does that matter at all? If you really want to stake your ground and think McCormick's right, why not just say any time a private right is taken by anyone, it has to be through an Article III form? Hootman, in large measure, Justice Gorsuch, because of several of this Court's cases, in Shore, for example, in Procter and Gamble. Breyer's about the line between public and private rights. You can stake your ground and simply say this is a private right? We certainly do stake our ground on that it's a private right. We think this Court has held as much already in forms and when Congress had included Inter Partes Review in the Patent Act of 1790, would you make the same argument? Would you still say it's a private right? Yes, we would, because even in 1790, Your Honor, there would still be a 200-year history of these rights being adjudicated in courts. But do you think Congress was under an obligation to create the patent system, a constitutional obligation to do it? No, we don't. So could it do it subject to the grant these monopolies subject to this limitation? I think there are any number of ways that Congress could certainly permissibly condition a grant of a patent. What it can't do is exert an unconstitutional condition on it, either under takings or due process or Article III. So is your position that somehow at the founding in 1789, given the replete English history of the Crown and the Privy Council, sidesetting any judicial adjudication of validity, that in 1789 the founders intended to change that system as radically as to say, no, we're not going to permit either the legislature to change the terms of the patent grant? The way I would respond, Your Honor, I think with respect to the history, I think the history here is very strong, that at the time of the founding and for centuries before, that English courts at law, this was precisely, this wasn't just the stuff that was decided in the courts at Westminster at 1789, it were those procedures. Sotomayor Your amici, your strongest amici says that it had waned. The Privy Council's adjudications had waned over time, and that they could only find 10 times over a 20-year period preceding 1789 in which the Privy Council had acted. But the fact that it waned didn't mean it was eliminated, and it didn't mean that the Privy Council or the Crown thought that it no longer had those rights. Respectfully, Your Honor, I believe that it did. The Privy Council revoked its last patent in any case, ordinary or otherwise, in 1779, and that was only after it was a national security case in which the Privy Council had told the patent holder that the proper thing to do was to go to a court of law, and the patent holder refused to do it, and it actually involved cannons. And so with the American Revolutionary War and the offing, that was the very last time that the Privy Council revoked a patent. And, in fact the patent in way back in 1787, 1789, who granted the patent? It would have, in England, it would have come, it would have come from, from the Crown, according to. Kennedy Was it subject to findings about novelty, non-obviousness? Yes, it absolutely was. And in disputes between. Was that statutory or was that just the custom? Well, the statute of monopolies in 1624 referred to that the validity of patents should be decided as at common law. And at common law, issues of novelty, precisely the issue here, was a question of fact, and disputed facts were resolved by, by juries. And the King couldn't say, I made a mistake. Well, the statute of monopolies in 1624 said the validity of a patent should be decided at common law. We don't disagree that the Privy Council revoked patents after it, but it did so pursuant to, to, to proceedings and not simply as a, as a matter of grace. And if I may reserve time for rebuttal. Thank you, counsel. Thank you. Mr. Keyes. Mr. Chief Justice, and may it please the Court, IPR, Inter Partes Review, comports with both Article III and the Seventh Amendment for at least the following three reasons. First, Inter Partes Review simply reexamines the propriety of the original grant of a patent engaging in the same type of patentability analysis entrusted by Congress to the executive since 1790. The process itself is not inherently judicial, and it does not involve the exercise of the judicial power. Next, Inter Partes Review does not extinguish, in the language of the question presented, private property rights. To the extent standards of patentability were not met initially, the patent simply should not have issued. And finally, although we don't believe respectfully the Court need reach this question, Inter Partes Review satisfies any test under any of the Court's public practice. Breyer, at some point. I mean, what I've wondered as I've read this is, suppose that just what you say happens with all we're doing is reexamining the patent and the statute provides it. But suppose that the patent has been in existence without anybody reexamining it for 10 years, and moreover, the company's invested $40 billion in developing it, and then suddenly somebody comes in and says, oh, we want it reexamined, not in court, but by the patent office. Now, that seems perhaps it would be a problem or not. I don't think so, respectfully, Justice Breyer. And here's why. Fifteen years? I don't know that the timeline 30, everybody. I don't know how long they last, but, you know, some last in a long time. Respectfully, I don't think that it matters, certainly not constitutionally, but even in the structure of the patent statute, the patent scheme that's been created by Congress. Congress established certain patentability criteria that need to be met. And all patents are taken. Everybody's dead, by the way, who actually knows about the original article written in Danish that nobody found except this one guy who happens to be sued for infringement. All patents are taken subject to these patentability standards. Yes, but I'm just saying, can it be anything? Can it be anything at all where you're going to reexamine, do people gain a kind of vested interest or right after enough time goes by and they rely on it sufficiently so that it now becomes what? Is there something in the Constitution that protects a person after a long period of time and much reliance from a reexamination at a time where much of the evidence will have disappeared? Respectfully, Your Honor, I would say no, because there's no reason to do that. How about if there were no judicial review at all? Well, I think if there were no judicial review at all, that presents a different question. Yes, then you would have to say yes, right? Well, I don't know that I would have to say yes, because we're still talking about a patentability determination that's being made by the executive branch. This is an executive adjudication, and adjudications are not themselves inherently judicial. So your position, it strikes me, is simply that you've got to take the bitter with the sweet. If you want the sweet of having a patent, you've got to take the bitter that the government might reevaluate it at some subsequent point. Yes. Yes, Mr. Chief Justice. Well, haven't our cases rejected that proposition? I'm thinking of the public employment cases, the welfare benefits cases. We've said you cannot put someone in that position. You cannot say if you take public employment, we can terminate you in a way that's inconsistent with due process. I don't think respectfully, Mr. Chief Justice, this is inconsistent with due process. I also think that the scheme itself is set up so that these rights are taken subject to the power of Congress to determine patentability.   there's a lot of other things that you can do. Roberts, I mean, what about, in terms of due process, anyway, what about this business that maybe it's in the Petitioner's Brief that the Commissioner can change the panels if she doesn't agree with the direction they're going, that she can add new judges to the panel so that they'll – in other words, it's a – the panel itself, and I think constitutionally this may be fine, is a tool of the executive activity rather than something involving anything resembling a determination of rights. Well, Mr. Chief Justice, the panel packing, if you will, mentioned by Petitioner in the briefs, I don't believe, and I'll leave it to the government to have the exact statistics, precise statistics, but I don't believe that that's taken place more than one or two times, and I don't believe it's taken place with respect to the Court. Well, suppose it were rampant. Well, if it were rampant, then I think what this Court said in Quazzo that was written, that the shenanigans point, if you will, that the Administrative Procedures Act and other provisions of the Constitution would deal with infirmities in a particular case on an as-applied basis. But I don't think that the potential for there to be mischief afoot of the Court is what troubled me deeply about you telling Justice Kagan that without judicial review that this would be adequate. I mean, for me, this what saves this, even a patent invalidity finding can be appealed to a court. There is deference with respect to factual matters, but there is de novo review as to legal matters. So how can you argue that the Crown, the executive, the PTO, here has unfettered discretion to take away that which it's granted? Justice Sotomayor, I did not mean to imply that there is unfettered discretion. What I would say is that without judicial review, what else is it? No, I think with respect to this process, there is judicial review. Well, now, counsel, there's only judicial review if somebody appeals. This isn't like an adjunct to the district court, like a magistrate judge or a bankruptcy judge. And I didn't see any argument in your brief under Crowell or something like that, that this is really an Article III adjunct. I saw an argument that this stands alone fine in the executive branch and that there is, in fact, a self-executing judgment issued by the director that if not appealed, has all the force of law of an Article III court. Did I miss something? No, Your Honor. It is subject to the Article III review. It's subject to review. If somebody takes review. But if not, it's binding, right? Well, I think that would be true with respect to any, even in the original examination  I mean, the other people don't agree with that. Well, it's not true with respect to magistrate judges or anything like that. You have an absolute opportunity. A district judge has to put his imprimatur on it before it has an adjunct of the district court. No, Your Honor, because this is a different structure. This is the same patent. It's the same patentability determination that's made during the original examination. Do you think it would work if we had land patents subject to the same circumstances that they could be reexamined at any time over hundreds of years, even after the farmer had sold the land, or the developer had built the houses, and that the land patent could be revoked by the government by bureaucracy, I suppose, in the Department of Interior? I think that there is a distinction. But that it is subject to packing by a director who is unhappy with the results. There is a fundamental distinction between, respectfully, between land patents, which grant fee-simple title to the holder. A monopoly in the use of land. What's the difference between the operative difference, other than obviously one is land? Well, one is a core fundamental right, to borrow the expressions of the Court. It's more of a Lockean interest. It's a fundamental right. It's a property interest. Isn't that question begging about what's a private right? Isn't that the very question this Court has to decide? Respectfully, as I began, I don't believe that the Court does need to decide it, because this is an executive adjudication. But to the extent the Court looks to those factors, I think under almost any test the Court has established, we have a right that derives solely from and depends solely on a Federal statute. There are no common law antecedents. The Petitioner has not disputed that. The cases in this Court establish that patent law in the United States is statutory. The adjudication implicates a paramount public purpose. The grant of a patent is the grant of a monopoly, but it's a grant — it's granted for the purposes of the sovereign. It is not granted for the purposes of the inventor. It benefits the inventor, certainly. But the paramount public purpose that is embedded in every patent is the advancement of the progress of science. Verrilli, Fair enough, when it's granted. But once it's granted, there's an abundance of law going back 400 years, Justice Story says it. I mean, you know, it's not a new idea that once it's granted, it's a private right belonging to the inventor. Justice Story said it is a property that has an inventions of a property which is often of very great value in which the law intended to give him, the inventor, absolute enjoyment. Kennedy, that's the constitutional provision. Verrilli, yeah. Kennedy, securing for limited times authors and inventors the exclusive right. Verrilli, securing to them, not securing to them. But those cases were decided, first of all, as the discussion earlier revealed, they were decided on a statutory basis. There was no undertaking by the Court to determine that constitutionally Congress could not establish the structure that they have. And in the current case review. Ginsburg, I think Ms. Ho conceded that there can be an examination, reexamination. Some of the questions raised in the last few minutes suggest that there could be no reexamination. It's a private right. It can't be taken away. But Ms. Ho, I think wisely, recognized that the reexamination procedure between the government is okay. But the problem here is it looks too much like a court proceeding. May I ask a problem, Mr. Chief Justice? Justice Ginsburg, what you're hearing from the Petitioner is a process versus power argument. The quarrel is with the process. The Petitioner has conceded that the power exists, the power of revocation. Even though there are citations in the brief that make that argument seem, their argument inconsistent, this is a process versus power argument. And in this Court, a unanimous court in Quazo determined, they looked at these same factors and determined that this is not an adjudication, that this is an executive branch action, and therefore, because the purpose of it is to reexamine the patent. Thank you, Mr. Chief Justice. Mr. Stewart. Mr. Chief Justice, and may it please the Court. A Petitioner and some of the questions from this Court have identified two potential challenges to the inter partes review procedure. The first is that this can't be done by executive branch officials because the effect of patent cancellation is to take away a private property interest. The second, and this is Petitioner's argument, is that this can't be done in the way that it's being done because the PTAB is using adversarial procedures. Mr. Stewart, could you address the Chief Justice's question, which I'm also stuck on, the bitter and the sweet? To what extent could the executive condition patents on, say, you have no takings rights later, or you take it subject to whatever conditions in terms of its withdrawal that we wish to impose? Well, I think if at the time Including maybe, and arguably I understand, the condition that we will stack the deck with judges whom we like, administrative judges we like. Well, I think if at the time of patent issuance the statute provided that the patent could be taken away for any otherwise appropriate governmental reason, that would be a constitutional scheme. Congress had no obligation to create a budget So to answer Justice Breyer's question, then, if there are all these reliance interests and $40 million or $1 billion spent, that would just be out of luck. Take the bitter with the sweet. Well, let me address directly the Chief Justice's question. Could you answer that question? It has always been part of the scheme that the patent could be reexamined, not by an administrative agency, but at least by a court at any time while the patent remained in force to determine whether the patentee was qualified for a patent in the first instance. So is the answer yes? The answer is that the patentee never had any expectation that having been granted a patent, its validity could be determined. So I take it the answer is yes. The answer is yes, because the rule from the start was you get the patent, but it is not immune from Well, how can how does that work, since this patent was issued before there was inter partes review, before the America Invents Act? There was ex parte reexamination. There was the possibility of judicial proceedings in which patent validity could be called into question to determine I mean, the inter partes review changed those things. It is something different, including particularly with respect to the procedures. Well, to go directly to your question about public employees, because I think it is a good analogy, the Court has said that if a public employee has tenure protection, a guarantee that he or she can be fired only for cause, then the employee has a property right in his job. Well, sure, that's just defining what the suite is. But it sounds to me like your position is if the government says you are hired for this job, and if we terminate you, we will flip a coin and decide whether or not you get to stay or not. No. First, the procedures still have to be fair. They have to comport with due process to determine whether you in fact committed the acts that would justify a termination for cause. But I want to make two points about that. The first is, even though the firing would have to comply with the due process clause, there is no rule that it could only be done by an Article III court. Executive branch officials make decisions all the time that tenured Federal employees should be fired because they have done things that justify their termination for cause. The Federal government has to use fair procedures when it makes that decision. It's subject to judicial review. But the decision can be made in the first instance by executive branch officials. The second thing you can do is to make a decision in the second instance by an executive   I don't think it was illegal under those three occasions, but I think it was less extreme than that. It had functional similarities to a court of appeals granting re-hearing on Bonk because the full court doesn't like the initial panel decision.   The Chief Judge of the Pete Brown. You're talking about the executive employee. An executive branch official. The Chief Judge of the Pete Brown. When we say judge, we usually mean something else. You mean an ALJ. There are administrative law judges all over this country, aren't there? I'm sorry? The Chief Judge, as I understand these situations, was concerned that the panel is initially composed was likely to diverge from general PTAB precedent with respect to a matter that bore on the institution decision. And so the Chief Judge expanded the panel. It's not clear whether the Chief Judge picked judges that he had a particular reason to think would be sympathetic to a particular view. How did that case come out? I don't know how the institution decisions came out. This has not been done at the merit stage, if you will, when patentability was actually being determined. But our primary point would be that if there's a constitutional flaw in that procedure, then a person who is actually harmed by its use in a particular case. Mr. Stewart, let's say we had a land patent. Let's say the land patent said it becomes invalid if anybody uses the land in an improper way, in violation of an environmental law, labor law, you choose. And let's say the land then gets developed and it turns into a housing development outside of, I don't know, Philadelphia. And it turns out, though, that the great-grandfather who owned the land originally back when it was a farm, it indeed violated a labor or environmental law, rendering the land patent invalid on its terms. Couldn't the Bureau of Land Management, for example, or some other department, the interior official, just pull back the patent? Well, the Court said in some of the 19th century cases that with respect to land patents that transferred fee simple title, executive branch officials couldn't do that. I think it's unclear from the decisions whether they were constitutional holdings, but we'll accept for purposes of this case. Breyer. Well, you dispute that they're constitutional holdings and you're briefed. So presumably, there's nothing to prohibit the scheme I've just described in the government's position, correct? It's a yes or no answer I'm looking for. I would not concede the invalidity of that. Exactly. But I don't think that the position we're asserting in this case has any necessary implications. Is it possible you started out and you said this boils down to two different theories, and I didn't get the second. In my mind, and I'd like you to say whatever you want on any of them, but as to the first, there is, and the Chief did raise this kind of thing, is there a kind of what Brandeis said in Crowell was a due process problem? Is there a problem of it's unfair to hold these people to the new statute because they got their patent before the statute was enacted? That's one. That's a practical thing. And much of the questioning has been around that, different variations on that theme, what's unfair. The second is formal. That's the public versus private right theory. And the best, or at least most recent, articulation of that is in the Chief Justice's opinion in Stern. And the third is a vested right theory, which had great popularity in the 19th century and might have moved Justice Story, but in fact has happily sunk from sight. Now, is that, have I missed some basic theory? And is there anything you want to say about those? Let me address those in turn. As to the first one, the idea, does the patentee have some expectation that the patent can't be taken away in this manner because IPR didn't exist when this particular patent was granted? As I said before, it's always been part of the system that, at least in court and sometimes administratively, patents could be reexamined so long as they remained in force to see whether they complied with the initial conditions of patentability. This is not a case in which Congress has changed the substantive rules. And to return to the Chief Justice's hypothetical about public employment, if the executive branch Sotomayor, I'm sorry, that only existed as of 1981, correct? Well, there were more sporadic instances, and we've discussed them in our brief, in connection with reissuance of patents, in connection with interference proceedings. In some fairly idiosyncratic situations, there could be cancellation without judicial involvement. But you're right, it was only in the United States. Those were four cases, I believe, right, and involved foreign patent applicants, right? Well, the reissue wouldn't. No, not the reissue. The interference wouldn't necessarily involve patent applicants. You could have an interference proceeding whenever a new patent applicant said, I was actually the first inventor, and somebody else has gotten the patent who shouldn't have gotten it. But the invalidity, it's just those four cases you have, right? The foreign, that period of time when there was a brief statute permitting executive rejection of patents by foreigners. I'm sorry, I'm not sure. All right. Fair enough. What I was referring to more was the situation where, in an interference, the true inventor would, or the reputatively true inventor would say, this person shouldn't have gotten the patent because I actually invented it first. But to your, return to your question, Justice Breyer, and I'd like to go back to the hypothetical about public employment. The individual who's going to be terminated, even though he has four-cause protection, has due process rights, has to have fair procedures. I don't think anybody would say that if the executive branch devises more effective ways of monitoring its employees and is better able to detect employees who have committed acts that would trigger termination for a cause, that somehow the executive branch is forbidden to apply those to people who got tenure protections before those mechanisms were available. This is the case. Roberts. I'd like to just touch on more directly the Shor test for whether something is or isn't a public right. And as I understand it, it has five different factors that you consider, consent, this, this, this, and other things. And I'm wondering if that is a sufficiently stable and predictive test when you're talking about something like a property right. In other words, as Justice Breyer mentioned, people invest in their patents the tunes of billions of dollars in building the plant that's going to make the product that's going to make the product, and all that, and yet when you're deciding, when they're deciding, is this a right that I can securely rely on, they've got to go through these five factors, you know, any one of which can be determinative in a particular case. Stewart. I guess the first thing I would say about cases like Shor and Stern v. Marshall and Northern Pipeline is that they are really directed at a different sort of problem. In each of those canonical cases, the adjudicator was being asked to determine whether one party was liable to another for a violation of law. And in each case, the adjudicator was being asked to impose a money damages remedy, was asked to direct one person to pay money to another. And that's kind of a classic judicial function. And the question was, can that be performed by non-Article III Federal adjudicators as well? And the answer was, sometimes yes, sometimes no. Breyer. So is that, look, the answer, what I'm thinking, quite seriously, is to say, should we leave open, assuming I basically agree with you, but leave open the question of what happens if there has been huge investment? That, I think, is what was dividing, what was worrying Brandeis and Crowell. I think that we don't face it here in this case, and it seems to me it would be properly raised more likely under either a takings clause or the due process clause, probably. What do you think? I mean, I think in theory you could reserve it in the sense that no as-applied challenge has been made, but I think to suggest that invalidation of a patent was particularly, potentially vulnerable on that basis would cause many more problems than it would solve, because, well, Mr. Stewart. Ginsburg. Is there no limit on the time you can institute an interparties review? Is it any time at all, or is there a limit on it? There's no limit. It applies to any patent issued before, on, or after the date on which the AIA became effective. Now, obviously patent — And what happens if an infringement action is started first in court, and the alleged infringer then says, I want to go over to the patent office and institute an IPR proceeding? The defendant in that case would have a year to do that. If more than a year had gone by after the defendant was sued, IPR would be unavailable under the statute. If the defendant requests an IPR within the one-year period, then the district court has the option whether to stay the infringement action. And my understanding is more or less half the time the district courts will stay the proceedings. I think the idea behind the one-year limit is let's do this if we're going to do it at all before the proceedings have gotten too far along, before the district court and the parties have devoted too much work to it. But it often is the case, as it was in this one, that somebody requests IPR after being sued for infringement. How important, Mr. Stewart, is judicial review here? I mean, would you concede that there's a constitutional problem either if there's no judicial review at all or if the judicial review were deferential as to matters of law? I wouldn't — I would concede that it would be a constitutional concern. I don't think it would be an Article III concern. I think it would be a due process concern that the person was being divested of property potentially without due process of law. So I'm very happy that we have judicial review. I would like to say something about the standard of review there because I think it's important. As your question points out, the cancellation is not going to deprive the courts of any role in determining whether the patent was actually valid. The effect of the cancellation is simply going to be that the court will defer to the agency under a substantial evidence standard on questions of fact and will review legal issues de novo. And that's a less favorable standard of review for the patentee than would be applied in district court infringement litigation where the defendant would have to prove invalidity by clearing convincing evidence. But our view is that's a feature and not a bug of the system. That is, we want a standard of review that will take into account what the agency actually thinks. The justification for the clearing convincing evidence standard is the agency is on record having issued the patent as thinking that the patent is valid, and therefore, the court should be not entirely unwilling but reluctant to set that aside absent clearing convincing evidence. If we can find out that no, the PTO's current informed view is that the patent is valid, then it's entirely appropriate to have a standard of review that takes that into account. The point that I was making about cases like Stern v. Marshall is those are cases that the jurisdiction, the work of the federal courts is not defined in terms of legal issues that they can resolve.  And a dispute about whether one party will be required to pay money to another party is a case that's kind of the classic work of Article III courts. And so this Court has grappled and some would say struggled with the question of when is it okay to allow non-Article III federal officials to do that. You don't really need to get to that question, because here nobody is asking to hold Petitioner liable. The effect of a cancellation is not that Petitioner has to pay money damages. Sotomayor, so in your judgment, could Congress permit the PTO to adjudicate infringement actions? I think that would be much more difficult for two reasons, much more constitutionally problematic. The first would be an infringement action is a classic instance of one party attempting to hold another party liable, and the ordinary relief at the end of a successful infringement action is money damages. And so that would get the PTO much more out of its usual bailiwick and much more into the business that is usually performed by courts. And the second is there's no historical tradition of non-Article III federal adjudicators. Sotomayor, well, there's no historical tradition here, except the interference actions up until 1981 of the PTO cancelling issued patents. I guess 1980 is still almost 40 years ago, and I do think it's important to point out, it's an obvious fact, but it's still important to note, that the PTO is very supportive of IPR, but it's not something the agency came up with on its own. This is an act of Congress. It's entitled to judicial respect. Evidently, Congress, up until 1980, believed that the patent system could function adequately with only sporadic opportunities for administrative reconsideration of issued patents. But during the years since 1980, Congress has made a different judgment. It could have tried to beef up the initial examination process. It decided that the more efficient way, both from the standpoint of patentees as a group and for the public, the more efficient way was to use post-grant examination procedures that could target the particular patents that both were of questionable validity and were of sufficient commercial importance to prompt a motivated seller. If I understand your answer, an infringement action could be adjudicated by the director, so long as money damages were not sought, and that would be fine. So a declaration of non-infringement could be issued by the director, for example, right? It would be — even that would be harder to defend, because infringement — determining whether one private party's action infringes an existing patent is not part of the PTO's traditional work. When the PTO — So traditional being more than 40 years, but less than 400, or what's the cutoff? Well, I mean, since 1836, the PTO and its predecessor, the Patent Office, have decided whether patents should be granted. They have determined what, in effect, are questions of validity. Does this person meet the prerequisites for the granting of a patent? The last thing I wanted to say, to respond briefly to Petitioner's primary theory, which is that it's the use of adjudicative proceedings, proceedings that look like a trial, that renders this infirm. It happens all the time that executive branch agencies get input from private people before making their decisions. We've cited formal rulemaking as an example, which in rulemaking, of course, can be triggered by a petition from a private party. At congressional hearings, the members of Congress will listen to sworn testimony from witnesses who may express different views, and Congress ultimately decides how to vote. When the Solicitor General is deciding whether to file an amicus brief, we will read the papers that were submitted to this Court. We'll have meetings with the parties that resemble oral arguments. At the end of the day, what makes it unproblematic is that even though our procedures may resemble the Court's procedures, the decision that we make is the decision to file an amicus brief on behalf of the United States, so long as that's an appropriate exercise of executive branch authority, the fact that we get input from private parties can't render it constitutionally infirm. If there are no further questions. Roberts. Thank you, counsel. Ms. Ho, four minutes. Thank you, Your Honor. Three quick points. First, the government has conceded that at least some constitutional rights, I believe due process, cannot be suspended as conditions or such. That's subject to, and in our view, Article III is no different. Second, with respect to the colloquy about panel stacking, Article III entitles litigants not to have to worry about precisely that sort of executive influence. That is exactly what this Court, as this Court put it in Stern, as not to have decision makers in positions of having to curry favor with the executive. Wouldn't that be an obvious due process flaw? I would have thought in a case where it happens, it would have been an obvious due process flaw. I think even in cases like ours where it doesn't happen, every administrative judge of the 200 knows that this is something that can happen, that the director and the director has said, and I quote, that she justifies it. She's justified it to exercise, to make sure her policies, her preferred policies are enforced. But I think the government has conceded that due process has to be a check on administrative agency adjudications as well as court adjudications. And we certainly, we certainly don't disagree with that, Justice Ginsburg. Our point is that the existence of it, the existence of the panel stacking, shows precisely the danger of judges, of decision makers, who are subject to executive political influence. And third, in terms of conditions or subject to the patent. Ginsburg. They're the same people that grant the patent in the first place. They're executive officials. Courts don't grant patents. No. And certainly there is actually, it is the patent examiners who make the decision to issue. PTAB judges are not examiners. They are the patent judges. And with respect to waiver, we know what is required to waive Article III protections, as this Court made clear in Wellness. It is knowing and voluntary consent by both parties, which is absent here. It is Article III supervision, which this Court said in Stern. And Atlas Roofing is not satisfied by what this Court called ordinary appeal, which is all that this statute provides litigants in our situation. And I guess finally I would say, in response to the government's argument, this doesn't just, IPR doesn't just look like a trial, it is a trial. It hears and determines a cause between two private parties that results in a final enforceable judgment. Our objection is not to the use of third parties in any number of government proceedings, any more than we would object to a concerned citizen who calls the police to report a crime. Our objection is to the exercise of the judicial power by an executive branch tribunal in violation of Article III. If there are no further questions. Breyer, I guess the Federal Communications Commission, at least as they used to have it, where a citizen could come in and say, I want you to take away the franchise of KPIX, sounds to me as if you have described it perfectly. I guess that would be unconstitutional, too. No, Your Honor. And in fact, again, in any number, in the NLRB, in the FTC, the SCC, the CFPB, in all of these agencies, what ends up happening is that the government makes the decision to prosecute the action, to prosecute the complaint. It is the government, that is pure executive action. And under our argument against IPR, none of that would be affected whatsoever by invalidating IPR. Thank you, Your Honor. I mean, because there are formal adjudications all over the place in agencies. I mean, for example, the NLRB runs by formal adjudications, and indeed, when they try to make rules, Congress slaps them down and says, we want adjudications. So how is that different? Certainly, Your Honor, I think the big difference there is at the NLRB, it is the general counsel, it is the general counsel of the NLRB, it is the government that is bringing that action and that is prosecuting that action. So you're right, I think there is some confusion in terms of adjudication for rulemaking purposes, which is the government prosecuting the action and choosing that as opposed to rulemaking, which we're not challenging. Our challenge is to an adjudication in the Article III sense between two private parties where the government isn't engaging in the classic executive action of bringing the action or prosecuting action, but is adjudicating, is the decider of the action. Thank you, counsel. The case is submitted.